# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SEAN A. RIKER,

        Plaintiff,

    v.                                      Case No. 10-C-906

SHERIFF ROBERT CARLSON, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I. PROCEDURAL HISTORY**

On October 13, 2010, the plaintiff, Sean A. Riker ("Riker"), proceeding pro se, filed a complaint under 42 U.S.C. § 1983 alleging civil rights violations while incarcerated in the Racine County Jail. Riker claims that Sheriff Robert Carlson ("Carlson"), Captain Douglas Wearing ("Wearing"), Chief Deputy John Hanrahan ("Hanrahan"), Lt. Kevin Brown ("Brown"), and Sheriff Deputy Christopher Schmaling ("Schmaling"), all of whom were persons involved in his incarceration at the Racine County Jail, violated his right to due process by placing him in administrative segregation and violated the constitutional prohibition against cruel and unusual punishment in relation to his conditions of confinement. (Docket No. 1.) Riker claims that the 24 hour lockdown has resulted in multiple physical and emotional injuries. (Id.) Accompanying his complaint was a motion for leave to proceed in forma pauperis. (Docket No. 2.) The matter was randomly assigned to this court and the parties have consented to full jurisdiction of a magistrate judge. (Docket Nos. 6, 15, 16.) The court screened Ricker's complaint and permitted him to proceed

with claims regarding his conditions of confinement and whether his due process rights were violated. (Docket No. 13.) The court dismissed the Racine County Jail as a defendant. (Docket No. 13.)

The defendants submitted a timely answer to the complaint raising affirmative defenses. (Docket No. 14.) Riker then submitted a request for an order setting a deadline for the defendants to respond to his complaint. (Docket No. 19.) The court found Riker's request moot because the defendants had answered the complaint within the deadlines set forth in Federal Rules of Civil Procedure. (Docket No. 20.) Riker then filed a motion for the court to order the defendants to disclose requested discovery, alleging that his request for all e-mails regarding his 24 hour confinement had not been met. (Docket No. 23.) Riker also submitted a request for representation by a court appointed attorney. (Docket No. 26.) The court denied Riker's motion to compel on the grounds that his request for any and all e-mail messages about his 24 hour confinement over a thirteen month period was overly broad, and a search of thirteen months of e-mails would be burdensome. (Docket No. 27.) Further, Riker's request for a court appointed attorney was also denied on the basis that he failed to meet the requirement of establishing his unsuccessful attempts to obtain legal counsel on his own, and that he demonstrated competence to represent himself. (Docket No. 27.) Riker then filed another motion to appoint counsel, this time including evidence of his attempts to retain representation. (Docket No. 29.) The court denied the motion, acknowledging that even though Riker satisfied the requirement to attempt to retain counsel, assessing the nature and difficulty of the case, he demonstrated sufficient competence to represent himself and the appointment of counsel would not make a difference in the outcome of the case. (Docket No. 30.) Riker requested the court reconsider based on his professed lack of legal proceedings and ability to engage in legal research. (Docket No. 31.) The court denied Riker's request for reconsideration. (Docket No. 33.)

On January 29, 2012, the defendants filed a motion for summary judgment. (Docket No. 35). The defendants submitted their proposed findings of fact, (Docket No. 36), and a brief in support of the motion for summary judgment, (Docket No. 37.) Riker responded by alleging that the defendants' submissions are confusing and that the facts set forth in the supporting affidavits are "falsehoods." (Docket No. 41.)

**II. SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson, 477 U.S. at 248. A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**III. FACTS**

According to the defendants' submissions in support of summary judgment, which Riker has failed to appropriately contest, Riker was booked in to the Racine County Jail on November 11, 2009, being held on numerous felony charges including multiple counts of First Degree Recklessly Endangering Safety, Possession of a Firearm by a Felon, Strangulation and Suffocation, Child Abuse—Causing Mental Harm, and Child Abuse—Intentionally Causing Harm. (Docket No. 36, ¶1-2.) While awaiting trial, Racine County Jail staff initially housed Riker in administrative segregation due to the potential safety and security threat he posed within the jail. (Docket No. 36, ¶ 3.) The Racine County Jail policy regarding administrative segregation provides that the decision to place someone in segregation can be based on purely subjective evaluations and predictions of future behavior or on informed predictions based on past behavior. (Docket No. 36, ¶ 25.) Segregation is designed to help protect those threatened by the behavior of the inmate as well to protect the inmate himself. (Id.) An inmate who displays or threatens aggressive behavior towards staff or other inmates or has any sort of disciplinary problem may need administrative segregation. (Id.)

Internal investigation revealed that Riker subscribed to a white supremacist ideology, the expression of which could pose a threat to the safety of other inmates, jail staff, or Riker himself due to the ethnic and racial diversity of the general population. (Id ¶ 3.) Riker's assignment to administrative segregation was done as a precautionary measure, pursuant to jail policy, in an effort to maintain the safety and security of the jail environment. (Docket No. 36, ¶ 4.) Inmates in administrative segregation are allowed to have one hour per day outside their cell to shower, use the

4

phone, and exercise in the day room. (Docket No. 36, ¶ 5.) On November 28, 2009, Riker filed an inmate request/complaint demanding to be placed in general population, to which Sheriff Thompson responded and advised Riker that his classification was to ensure jail security and safety and his classification would be reviewed every ten days. (Docket No. 36, ¶¶ 6-7.)

On December 20, 2009, Riker flooded his cell and broke the seat off his desk, then pounded the heavy metal seat against the cell door, causing jail staff to transfer him to a different cell. (Docket No. 36, ¶ 8.) On December 29, 2009, during a meeting with a mental health worker, Riker broke a cell door and shouted racial slurs, which were directed at other inmates. (Docket No. 36, ¶ 9.) On December 31, 2009, Riker was yelling at inmates from day rooms 2 and 3, and Officer Hernandez advised Riker to stand down. (Docket No. 36, ¶ 10.) Riker refused to stand down and yelled to "get those niggers away from the windows" and asked Officer Hernandez for "any nigger to kill." (Id.) Riker also threatened to kick Officer Hernandez's "ass." (Id.) On January 2, 2010, Riker threatened staff members standing guard during his shower, specifically telling Sergeant Gonzales that "I'm gonna catch you when you don't have five people around you. I'm gonna remember your face you fucking spic, and you're gonna remember mine." (Docket No. 36, ¶ 11.)

On January 6, 2010, Riker forced his solid cell door open by kicking the door with such force that the welds broke, and was then able to push the lower portion from its track, allowing him to exit the cell. (Docket No. 36, ¶ 12.) After exiting the cell, Riker used a metal electrical junction box he pried from the wall to break six cell windows, two day room windows, and nine light fixtures, depriving the jail of the use of eight cells for approximately one month. (Id.) That same day, command staff met to formulate an action plan for safely housing Riker to prevent further damage to the facility but in a manner in which he would not be able to carry out his threats. (Docket 36, ¶ 13.) At the meeting, the command staff decided Riker needed to be housed by himself in a modified cell and two man day room on administrative segregation status for safety and

5

security reasons shown from his multiple and continued violent outbursts and threats. (Docket 36, ¶ 14.) These cell modifications included preemptive removal of items to prevent Riker from using them as weapons against people or to damage property. (Id.) In addition to the removal of items from his cell, Riker would be allowed to be out of his cell only with the Correctional Emergency Response Team ("CERT") standing by for showering and phone use, (Docket No. 36, ¶ 15), during which time his cell would be cleaned and searched, (Docket No. 36, ¶ 16). The staff also determined that Riker would not be allowed in the dayroom without leg irons and belly chains, and made special security measures for transporting him to and from the courthouse. (Docket No. 36, ¶¶ 17-18.) Riker claims that the belly chains and leg irons caused him severe physical injuries due to the way he had to position his body to use the phone and the mental strain of administrative segregation and limited recreation time caused severe mental and psychological injury. (Docket No. 1.)

Following these security measures, Riker again on January 12, 2010 tampered with a sprinkler head but was stopped and secured to a body board when he threatened to disarm a guard carrying a taser. (Docket No. 36, ¶ 19.) On January 22, 2010, he was transferred to a cell on "2D", where he remained for the rest of his time at the Racine County Jail. (Docket No. 36, ¶ 20.) Once in 2D, due to Riker's prior threats, acts of violence, and repeated property damage, it was determined that Riker would be allowed out of his cell on only Mondays, Wednesdays, and Fridays during first shift, in which he was allowed to use the common room/day room for recreation while the CERT team supervised him. (Docket No. 36, ¶ 21.) On July 28, 2010, Riker was out of his cell for shower and exercise when he slipped out of his belly chain. (Docket No. 36, ¶ 24.) Riker yelled racial epithets at black inmates in nearby day rooms as he swung the belly chain around, using the still-attached padlock to damage windows of the neighboring day rooms. (Docket No. 36, ¶ 24.)

Lt. Brown conducted periodic reviews concerning Riker's administrative segregation status, but Riker remained housed in administrative segregation for the remainder of his time at Racine

6

County Jail due to continued threats towards inmates and staff and destruction of property. (Docket No. 36, ¶¶ 22-23.)

**IV. ANALYSIS**

Riker claims the defendants violated his Eighth Amendment right against cruel and unusual punishment and his Fourteenth Amendment right to due process. It appears that Riker, while in the Racine County Jail and during the time of the alleged constitutional violations, was a pretrial detainee. As a pretrial detainee, both claims will be analyzed under the Fourteenth Amendment. Jackson v Ill. Medi-Car, Inc., 300 F.3d 760, 764 (7th Cir. 2002). The constitutional rights of a pretrial detainee are derived from the due process clause of the Fourteenth Amendment and are distinguishable from an inmate's right not to be subjected to cruel and unusual punishment under the Eighth Amendment. Board v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005) (citing Bell v Wolfish, 441 U.S. 520, 535 (1979)). Although the Eighth Amendment does not apply to pretrial detainees, detainees are entitled to at least as much protection as the constitution provides convicted prisoners. Id. (internal citations omitted). Although there is a distinction, it is of little significance in application, and courts have found it appropriate to use the same standard for claims arising out of both the Eighth Amendment (convicted prisoners) and the Fourteenth Amendment (pretrial detainees). Id. (citing Henderson v. Sheahan, 195 F.3d 839, 845 (7th Cir. 1999)).

**A. Plaintiff's Due Process Claim**

The court begins its analysis with Riker's claim that his placement in administrative segregation upon booking, without an initial hearing, and his continued segregation status throughout his stay at the Racine County Jail, was a deprivation of due process. "A person has a liberty interest in avoiding placement in a status that is atypical and imposes a significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). If a liberty interest exists, then due process requires informal, non-adversarial, but

7

periodic review of the confinement. Alston v. DeBruyn, 13 F.3d 1036, 1042 (7th Cir. 1994) (citing Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 462-63 (1989); Hewitt v. Helms, 459 U.S. 460, 472 (1983)). A condition of confinement may be imposed on a pretrial detainee without violating the due process clause if it is reasonably related to a legitimate and non-punitive governmental goal; it may not be arbitrary or purposeless. Antonelli v. Sheahan, 81 F.3d 1422, 1428 (7th Cir. 1996) (citing United States v. Salerno, 481 U.S. 739, 747 (1987)). Safety and preventing danger to the community are legitimate governmental goals that outweigh an individual's liberty interest, depending upon the circumstances. Id. A pretrial detainee has a right to due process before conditions or restrictions are imposed upon him only if those restrictions or conditions amount to punishment of the detainee. Bell v. Wolfish, 441 U.S. 520, 536 (1979).

In the case at hand, Riker was placed in administrative, non-disciplinary segregation immediately upon booking. (Docket No. 36, ¶ 3.) This was done for safety and security reasons that the jail staff identified during the preliminary internal investigations. (Docket No. 39, ¶ 4.) There is a liberty interest in avoiding placement in a status that is atypical, but there is nothing atypical about Riker's placement. According to Racine County Jail policy, inmates are placed in administrative segregation for a multitude of reasons, including potential safety risks to the general population. (Docket No. 36, ¶ 25.) Also, according to the policy, a subjective evaluation of potential future risk is a reason for placement in administrative segregation. (Id.) The Racine County Jail staff, which identified and evaluated potential future risks regarding Riker in general population, acted in accordance with the jail's own policy in placing Riker in administrative segregation. Riker was not deprived of any liberty interest he possessed because his placement was in accordance with the policy governing all persons detained at the jail. Riker was dealt with in accordance with that policy and therefore, his placement cannot be considered "atypical."

Of course, Riker has a liberty interest in avoiding placement for no reason or for reasons that are baseless. This is where adherence to the jail policy regarding placement in administrative segregation is critical. Given the facts of this case, the policy was followed and Riker's placement was warranted. There is no due process violation because Riker's placement and subsequent conditions were reasonably related to a non-punitive governmental goal—safety to the general prison community, staff and inmates alike. Riker's placement was not punishment for any conduct, but was done for his benefit and the benefit of his fellow inmates and the prison staff. The staff recognized the potential security and safety risks that could result from Riker's expression of his racist attitudes within the ethnically and racially diverse general prison population. The staff was legitimately concerned that Riker's continued presence in the general population would be the fuel to create an explosive situation, endangering the safety of inmates, staff, and Riker. The safety risks to the prison community presented by Riker's attitudes and behavior far outweigh any liberty interest Riker may have had in avoiding placement. Since this is a legitimate goal and jail policy was followed, there is no violation of due process.

Riker, along with his initial placement, also complains of his continued segregation status with limiting conditions, and continued denials of requests to be in general population. Riker was not deprived of any procedure since his status was reviewed periodically, every 10-14 days, and his continued requests were read and considered. (Docket No. 36, ¶ 22.) Wearing instructed Brown to conduct these reviews, and they were carried out. (Docket No. 38, ¶ 10.) As indicated, due process requires only informal, non-adversarial, periodic reviews of status. The decisions made thereafter not to return Riker to the general population are fully justified based on his actions damaging property damage and his threats to staff and other inmates while in administrative segregation. (See Docket No. 36, ¶ 23.) Continued placement in administrative segregation was warranted for the same reasons he was initially placed there—safety risks to the prison community.

It is not difficult to see that Riker posed a threat to the general population, and his conduct warranted his stricter limiting conditions within administrative segregation. These stricter conditions were not punishment or retribution, but necessary measures to ensure the safety of the staff and other inmates. Riker was able to destroy property and even escape from his cell and belly chain, so the heightened conditions were necessary to make sure that Riker was physically unable to continue the property damage and potentially carry out one of his many threats to staff and other inmates. The restraint measures may have been a hardship for Riker, but they were necessary. Due to the necessity and purpose of the stricter confinement, and the periodic reviews throughout his segregations status, the court finds no violation of due process in Riker's continued segregation status.

The defendants have presented the measures taken to restrain Riker, but Riker claims that the multiple incident reports and continued misconduct warranting the restrictions are "lies and half truths." (Docket No. 41.) Although he makes this conclusory assertion, he has not presented anything specific to place these facts in dispute. The court concludes that the conditions imposed on the plaintiff were not punishment and did not violate due process.

### B. Plaintiff's Cruel and Unusual Punishment Claim

The court now looks to whether or not the conditions of the Riker's confinement in administrative segregation amounted to cruel and unusual punishment. Riker claims that the conditions of his confinement, most notably his restriction on recreation and yard time, subjected him to cruel and unusual punishment as prohibited by the Eighth Amendment. As noted above, because Riker was a pretrial detainee, his claim is to be analyzed under the Fourteenth Amendment.

The mere fact that pretrial detention interferes with a person's desire to live comfortably and free from restraint does not by itself make the conditions unconstitutional. Board v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005). In order to be cruel and unusual, there must be a denial of "basic

10
Case 2:10-cv-00906-AEG   Filed 07/13/12   Page 10 of 13   Document 46

It is not difficult to see that Riker posed a threat to the general population, and his conduct warranted his stricter limiting conditions within administrative segregation. These stricter conditions were not punishment or retribution, but necessary measures to ensure the safety of the staff and other inmates. Riker was able to destroy property and even escape from his cell and belly chain, so the heightened conditions were necessary to make sure that Riker was physically unable to continue the property damage and potentially carry out one of his many threats to staff and other inmates. The restraint measures may have been a hardship for Riker, but they were necessary. Due to the necessity and purpose of the stricter confinement, and the periodic reviews throughout his segregations status, the court finds no violation of due process in Riker's continued segregation status.

The defendants have presented the measures taken to restrain Riker, but Riker claims that the multiple incident reports and continued misconduct warranting the restrictions are "lies and half truths." (Docket No. 41.) Although he makes this conclusory assertion, he has not presented anything specific to place these facts in dispute. The court concludes that the conditions imposed on the plaintiff were not punishment and did not violate due process.

### B. Plaintiff's Cruel and Unusual Punishment Claim

The court now looks to whether or not the conditions of the Riker's confinement in administrative segregation amounted to cruel and unusual punishment. Riker claims that the conditions of his confinement, most notably his restriction on recreation and yard time, subjected him to cruel and unusual punishment as prohibited by the Eighth Amendment. As noted above, because Riker was a pretrial detainee, his claim is to be analyzed under the Fourteenth Amendment.

The mere fact that pretrial detention interferes with a person's desire to live comfortably and free from restraint does not by itself make the conditions unconstitutional. Board v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005). In order to be cruel and unusual, there must be a denial of "basic

human needs" or the "minimum measure of life's necessity" Rhoades v. Chapman, 452 U.S. 337, 347 (1981). Claims of cruel and unusual punishment require the plaintiff to show he has suffered an objectively, sufficiently serious injury, and that prison staff inflicted the injury with deliberate indifference. Framer v. Brennan, 511 U.S. 825, 834 (1994). The standard for deliberate indifference is that the defendant committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant knew of an impending harm. Antonelli, 81 F.3d at 1427 (citing Miller v. Neathery, 52 F.3d 634, 638 (7th Cir. 1995)). In terms of length of confinement with recreation restrictions, more than 90 days of confinement without yard time is considered cruel and unusual, but preventing access to the yard to protect prison staff from violent behavior is reasonable, regardless of the time. Pearson v. Ramos, 237 F.3d 881, 885 (7th Cir. 2001). "To confine in 'solitary' a prisoner who behaves like a wild beast whenever he is let out of his cell is the least cruel measure . . . for dealing with such a person." Id.

In the case at hand, Riker was not completely deprived of his time out of his cell. At the onset of administrative segregation, Riker was allowed his mandatory one hour per day recreation time. (Docket No. 36, ¶ 5.) This privilege was slowly taken away because of Riker's violent acts, threats, and property damage any time he was let out of his cell. Although his recreation time was diminished, it was never completely taken away. At the end of his stay in Racine County Jail, Riker was still allowed out of his modified cell three days a week, Mondays, Wednesdays, and Fridays. (Docket No. 36, ¶ 21.) He was to be in belly chain and leg irons while out of the dayroom. (Docket No. 36, ¶ 17.) These conditions of confinement are fully compliant with the enunciated standards as to what is, and is not, cruel and unusual. Riker was not denied any basic human need, as he was still allowed out of his cell to shower and use the phone, and he makes no claims of lack of food, water, or other basic necessity.

Riker claims severe mental and physical injuries, but shows no evidence as to the existence or severity of these alleged injuries. Injured or not, the jail staff did not act with deliberate indifference to his conditions of confinement, but acted out of necessity and concerns for safety. The planning and the diligence of the staff demonstrate that concerns for safety were taken into account, not just for Riker, but everyone. The intent of the staff was never to harm Riker and the actions taken were in accordance with legitimate penalogical policies. The irons and chains and limited recreation time were conditions necessitated by Riker's violent behavior and threats; they were not imposed for the purpose of punishment.

The fact that Riker was uncomfortable and his living situation was not free from restraint does not make the confinement conditions unconstitutional. The court finds that the staff acted for a legitimate governmental purpose; the conditions were necessary to restrain the uncontrollable Riker, and the conditions were not so severe as to constitute cruel and unusual punishment under the Fourteenth Amendment.

## V. CONCLUSION

The jail staff did not violate Riker's liberty interest when they placed Riker in administrative segregation, as his status and placement followed the procedures in the jail. Because his placement was for a legitimate governmental goal, one which outweighed any liberty interest, there was no due process violation. Neither were Riker's continued placement and limiting conditions a violation of due process because Riker was treated in accordance with an appropriate review procedure. His continued administrative status was warranted due to his behavior and the need to keep him segregated from the general population. Nor was Riker's confinement cruel and unusual. He was not deprived of any basic human need. The staff imposed very limiting conditions, but these were done out of necessity due to Riker's uncontrollable destructive and threatening behavior. For these reasons, the court concludes that there was no violation of due process and

12
Case 2:10-cv-00906-AEG   Filed 07/13/12   Page 12 of 13   Document 46

further concludes that the conditions of confinement did not constitute cruel and unusual punishment.

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment, (Docket No. 35), is **granted**. The clerk shall enter judgment dismissing the plaintiff's complaint and this action.

Dated at Milwaukee, Wisconsin this 13th day of July, 2012.

_____
AARON E. GOODSTEIN
U.S. Magistrate Judge

13
Case 2:10-cv-00906-AEG   Filed 07/13/12   Page 13 of 13   Document 46